### ALLEGED MISAPPLICATION OF TRUST COMPANY FUNDS.

Common Pleas Court of Hamilton County.

STATE OF OHIO v. GEORGE B. COX.*

Decided, July Term, 1913.

*Criminal Law—Chief Officer of a Bank Not Guilty of Misapplication of Funds of the Bank, When—Money and Funds Distinguished from Credits.*

In the prosecution of the president of a trust company for willful misapplication of its funds, with intent to defraud and injure the company, by loaning said funds without proper security to a corporation which proved to be insolvent, a motion lies at the conclusion of the evidence for the state to instruct the jury to return a verdict of not guilty, where the evidence fails to show that the defendant made any of the loans complained of or misapplied any of the moneys or funds of the bank, or any intent on his part to injure or defraud the bank, but on the contrary that he was justified by the information upon which he acted in believing that the loans were good and would be repaid, and complete exoneration of any part he may have had in the matter is found in the action in due course of the executive committee in authorizing the making of these loans and the approval by the board of directors of said loans after they were made.

CALDWELL, J.

At the conclusion of the evidence for the state, the defendant, George B. Cox, moved the court to instruct a verdict of not guilty, upon several grounds, to-wit:

First. That there is no evidence offered by the state showing that this defendant made any loans as alleged in the indictment.

Second. There is no evidence showing any misapplication by the defendant in this case.

Third. There is no evidence even tending to show that this defendant had knowledge of the conditions of the Ford & John-

---

*Exceptions to the ruling of the court of common pleas dismissed in the Supreme Court December 1, 1914, for failure to file the bill of exceptions within forty days of the rendition of the judgment.

son Company, whatever that condition may be claimed by the state to have been.

Fourth.   There is no evidence that the Ford & Johnson Company at the time of the loans complained of did not have sufficient assets to pay all liabilities.

Fifth.   There is no evidence of any intention on the part of this defendant to injure or defraud the Cincinnati Trust Company or any other person or corporation.

Sixth.   The evidence shows that the money and funds of the bank were not affected by the transactions complained of, but if anything was affected, it was a credit or credits, and there is no charge made in any of the counts in the indictment of any misapplication of the credits of the bank.

Seventh.   The evidence shows that the loans complained of were authorized by the executive committee and approved by the board of directors, and for that reason no crime was committed and no misapplication occurred.

As the court understands its duty in the premises, it is to examine with great care the evidence offered in the case and determine as a matter of law as to whether or not *substantial* evidence has been offered by the state against the defendant tending to prove his guilt as charged in the indictment or in any of its counts.

If such evidence has been offered, the motion of the defendant must be overruled, as the case is then one for the consideration of the jury, and the court has neither the power nor the inclination to invade the province of the jury and to usurp its functions; on the other hand, if the state fails to prove any essential element of the crime charged, then it becomes the duty of the court to so declare and arrest the case from the jury, and to order a verdict of not guilty.   Such is the settled law of Ohio.   *Goodlove* v. *State*, 82 O. S., 365-375;   *People* v. *Ledwon*, 153 N. Y., 10.

In the case of *Prettyman et al* v. *U. S.*, 180 Fed. Rep., 43 (the case referred to by the able prosecution, and which was decided by the Circuit Court of Appeals of the Sixth Circuit, and which court determined that the court below erred in not directing a verdict of not guilty as to Prettyman, and reversed

the case on other grounds as to others), the court quoted from the 173 Fed., at 581, as follows:

"There was a legal presumption that each of the defendants was innocent until he was proved to be guilty beyond a reasonable doubt.

"The burden was upon the government. to make this proof, and evidence of facts that are as consistent with innocence as with guilt, is not sufficient to sustain a conviction. Unless there is *substantial* evidence of facts which excludes any other hypothesis but that of guilt, it is the *duty* of the trial court to instruct the jury to return a verdict for the accused."

There is ample authority in this country establishing it as the duty of the trial court to direct a verdict of not guilty if the evidence offered to sustain an indictment is not strong enough to support a verdict of guilty, or is not of such convincing character as to overcome the legal presumption of innocence, for if the facts proven (which for the purpose of the motion will be taken as true) fail as a matter of law to overcome the presumption of innocence, or to show that a crime has been committed, or are so unsatisfactory that the court would set aside a verdict of guilty, then the jury has no function to perform, and it is the duty of the court to act.

The indictment is in nine counts, each charging the defendant Cox and others named with the offense set out. There is no substantial difference between one count and the others,, except that each charges a separate loan of money differing in amount and date from the others, and other and important differences occur, but they will not be discussed here, as they have no particular bearing upon this motion.

The counts set forth in effect the following allegations:

First. That the defendants named were officers, directors or members of the executive committee of the Cincinnati Trust Company, a corporation doing business as a commercial bank, savings bank and trust company, which was receiving money on deposit.

Second. That Cox was president, director and a member of the executive committee.

Third. That as such officers, directors and committee, the defendants having power of management, control and direction over the moneys, funds and credits of the trust company, did on the dates charged "unlawfully and wilfully misapply certain moneys and funds" of the said company and did intentionally and wilfully convert the same to the use of the Ford & Johnson Company, and for no use, benefit or advantage of the trust company.

Fourth. With intent to injure and defraud the trust company in a large amount.

Fifth. In the following manner the said George B. Cox (and others as aforesaid), as director and member of the executive committee, loaned and caused to be paid out of moneys and funds of the said Cincinnati Trust Company to the said the Ford & Johnson Company, through the Second National Bank of Cincinnati, Ohio, the sum of $17;500 (as charged in the first count), which said sum was paid on a certain draft drawn by the trust company upon the Second National Bank (in some instances on the First National Bank payable to the order of the Second National Bank, and in some instances to the Ford & Johnson Company).

Sixth. That the sum loaned was not well secured, or not secured at all, as Cox and others well knew, and that the Ford & Johnson Company was indebted to the trust company in very large sums, largely unsecured, and the Ford & Johnson Company was and had for some time prior thereto been unable to pay its debts, and was unable to pay its then indebtedness to the trust company, as Cox and others well knew.

Seventh. Whereby said sum was lost to the trust company and its moneys and funds depleted to the amount of the loan.

Certain facts will be assumed as established by the court for the purpose of this motion, to-wit:

First. The existence of the trust company and that it was a bank as described.

Second. The official relationship of the defendant to the trust company, as described.

Third. The powers and duties of the defendants in their official relationship.

Fourth.  That certain loans were made to the Ford & Johnson Company on the dates alleged.

Fifth.  That in making such loans drafts were made upon other banks, and that no moneys or funds were in fact taken out of the vaults of the trust company.

Sixth.  That as to seven of the loans, they were authorized in advance by the executive committee of the trust company, as appears by its records, introduced in evidence by the state.

Seventh.  That as to all of the loans, they were approved by the board of directors at its meetings held after each loan, as appears by the minutes.

This indictment was found under favor of Section 44 of the Thomas act (99 O. L., 278), now General Code, Section 12473, which declares that:

"Whoever, being an officer, employee, agent or director of a corporation, incorporated and doing business as a commercial bank, savings bank or trust company, having power to receive, and receiving money on deposit, wilfully misapplies any of the money, funds, credit or property of such corporation, * * * shall be fined," etc.

The defendant Cox is charged as president, director and a member of the executive committee.  As president his authority and duties are fixed by the by-laws and code of regulations of the company, as follows:

"No. 5.  *President*.—The president shall be the principal executive officer of the company, and as such shall have the general supervision and direction of its affairs.  He shall execute or cause to be executed the orders of the board of directors and executive committee; he shall be *ex-officio* a member of all committees, and shall attend their meetings when requested by the chairman."

By the by-laws, the executive committee is empowered as follows:

"No. 2.  The executive committee shall meet at least once a week and whenever requested by the president.  It shall be the duty of the executive committee to supervise and pass upon all loans, investments in stocks, bond, mortgages or other

securities, to examine and approve all loans made by the company, and to approve all contracts.''

Section 9782, General Code, provides that:

''A board of directors may appoint an executive committee, to consist of at least three of its members, with such duties and powers as are defined by the regulations or by the by-laws; who shall serve until their successors are appointed. Such executive committee shall meet as often as the board of directors require, which shall be not less frequently than once each month, and approve or disapprove all loans and investments; all loans and investments shall be made under such rules and regulations as the board of directors prescribe.''

Section 9729, General Code, provides:

''Minutes shall be kept of the meetings of such executive committee, including records of loans and investments, to be submitted to the board of directors for approval at each meeting. The minutes and records of such committee shall be kept on file.''

As to the board of directors, the General Code, Section 9727, provides:

''The corporate powers, business and property of corporations formed under this chapter shall be exercised, conducted and controlled by the board of directors, which shall meet at least once each month.''

Attention was called during the trial and upon the argument of this motion to General Code, Section 9754, providing that loans to one person or corporation shall not exceed twenty per cent. of the capital and surplus of the bank, but no penalty is attached to that section, and mere excessive loans or overdrafts are not criminal.

The gravamen of the offense charged is the wilful misapplication of the funds of the trust company by the defendant with intent to defraud or injure the trust company. It is elementary that the act (that is, in this case, the wilful misapplication), and the specific intent (that is, to injure or defraud) must co-exist, or there is no crime.

If a misapplication were made without intent to injure or defraud, one essential of the offense is missing and the accused is guiltless. It is not alleged nor claimed, but on the contrary it is expressly disclaimed by the counsel for the state in this case, that there was any plan and confederation, combination or conspiracy between the defendant Cox and any of the other defendants, to injure or defraud the trust company by misapplying its moneys and funds; and no evidence was offered of any such conspiracy.

The case then stands as though there were several indictments against the defendants, and each of them is answerable for his own acts, and only such.

This motion will have to be decided by an examination of the acts, knowledge and intent of the defendant as they have been proven by the state.

First. Has the state offered any substantial evidence such as is sufficient to overcome the legal presumption of innocence that the defendant Cox "loaned and caused to be paid out of the moneys and funds" of the trust company the sums charged in the indictment?

The evidence and records of the trust company show that as to seven of the loans described in the indictment, the applications for the same were submitted to the executive committee, and the loan in each of these cases was authorized. As to the remaining two loans, namely, those charged in the fourth and eighth counts, there is no record of such previous action.

In examining the evidence as to the acts of Cox as to these loans, it will be convenient to classify them as follows: First, count No. 1; second, counts Nos. 2, 3, 6 and 7; third, counts Nos. 4 and 8; fourth, count No. 5; fifth, count No. 9.

As to count No. 1, the minutes show that Cox was present at the executive committee meeting October 14, 1910, and at this meeting were also present Mr. Ireton, the attorney for the trust company, who was also a member of the committee then operating the Ford & Johnson Company, which asked for the loan of $17,500 for pay-roll purposes, and dwelt at some length upon the progress the committee in charge of the Ford & Johnson Company's affairs was making.

The record shows a motion was made to grant the loan, which motion was seconded, and "Upon vote being taken, was unanimously adopted." The entire committee was present except Mr. Davis, and all concurred, as appears by the record, in the action taken after discussion of the same.

No one has testified in the case that the defendant Cox voted for this loan, and it may well be doubted if the mere record showing unanimous adoption is sufficient to establish that fact; but as this count will fall under further consideration, it will be passed for the present.

As to the counts 2, 3, 6 and 7, the minutes of the executive committee show that Cox was present at each meeting involved in them. No motion was made or seconded by Cox; it appears that he presided at these meetings. No aye or nay vote is recorded; all that appears is that a motion was made to make the particular loan, "which motion was duly seconded and carried."

The record shows a sufficient number of the committee was present in each case to pass the motion and loan against the vote of Cox. The record does not show any act of participation by Cox in authorizing any of the loans included in this class.

As to the counts 4 and 8, it does not appear from the minutes of the executive committee that either of these loans was authorized. No evidence is offered to show or tending to show that Cox knew that these loans were made until afterwards. He did not order them nor in any way participate in them, so far as the evidence indicates. No officer or agent of the Ford & Johnson Company has testified that he consulted with Cox about these loans. So that there is an absolute failure to show- that he either "loaned or caused to be paid out" these sums.

And as to count 5, the minutes show that Cox was absent from the meeting and could not have participated in the action of the committee, his place being temporarily taken by Mr. Moch, the vice-president.

As to count 9, the evidence is that an aye and nay vote was taken on this loan, and all voted aye except Cox, who voted nay. This loan was made by the executive committee against the vote and wishes of Cox; and can it be claimed he is thereby re-

sponsible for loaning and paying out the money of the trust company?

It is argued by the prosecuting attorney he is guilty because he did not prevent the loan, despite the action of the committee. But it must be remembered the committee was created for the very purpose of passing loans, and the by-laws made it the duty of the president to carry out the orders of the executive committee.

It is in proof that each of the drafts named in the indictment is signed by the defendant Cox, and it is claimed that he participated in the loans by that fact. The undisputed evidence is that Cox was in the habit of signing as many as fifty drafts in blank at a time for the convenience of the trust company; that no draft so signed was valid unless signed by another officer of the company; that these drafts were left in charge of Mr. Sampson, the auditor of the company, and usually were given to Mr. Phelan, the bookkeeper, to keep during the day in his cage to be used by him as necessity arose in the regular course of the business. Mr. Phelan's positive testimony is that he did not take any one of the drafts to Mr. Cox for his signature, and that so far as he knew Cox never saw any one of them. The testimony is very clear upon this point, and it is proven that the drafts after being filled up and countersigned were not called to Mr. Cox's attention.

Again, when the loans were made there was no direction given to the executive officers of the company as to how it was to be done, whether by taking money out of the vaults, giving a cashier's check, which might be deposited in another bank, or by drawing upon any bank in which the trust company had credit.

The method of doing it was neither directed nor controlled by the executive committee, and so far as the evidence shows, Cox gave no direction as to the matter. He therefore can not be charged with knowledge that the drafts he had signed were being used for these loans.

Upon the first ground stated in the motion, the court is of the opinion that not only is there not substantial evidence against the accused tending to show he loaned or caused to be

loaned the sums charged, but that there is a total failure of evidence to show that he participated in making such loans or any of them.

Second. The second ground of the motion is: "There is no evidence showing any misapplication by the defendant in this case."

It might be sufficient for the court to say that inasmuch as the evidence fails to show any participation in making the loans, it must necessarily fail to show any misapplication by the defendant; but the court has been impressed by certain very important facts which have been proven, tending to show lack of intentional, wilful misapplication of moneys and funds of the trust company, which will be more fully discussed in the consideration of the fifth count of the motion.

Third. Third part of the motion is: "There is no evidence even tending to show that this defendant had knowledge of the condition of the Ford & Johnson Company, whatever that condition may be claimed by the state to have been."

What does the evidence show that Cox knew concerning the financial condition of the Ford & Johnson Company when any of these loans were made? Cox had been president of the Ford & Johnson Company for several years. The testimony is that he never examined the books or entries in the books, though he attended meetings of the company and received a salary. Mr. A. B. Martin was its general manager.

Mr. Powell testified that Martin was very optimistic as to the future of the company and gave very promising accounts of its progress and prospects. Mr. Powell became treasurer in the early part of 1910, and by reason of some financial disfavor into which he thought the company had fallen, he proposed a reorganization and submitted a plan in which a new company was to be organized, which should take over all the assets of the company and its branches, which Powell valued at from three million to four million dollars. Some time later Powell claimed to have discovered some inaccuracies in the former statement of the company which were not known to Cox, and thereupon Cox ordered a thorough audit of the company's assets and gave directions to all of the company's employees to assist the account-

ants, the Price-Waterhouse Company of New York and Chicago, in making the audit and appraisement.

Powell stated at one time in New York that Mr. Cox stated to him he did not think the Ford-Johnson Company was any good or ever would be. Powell resigned in August, 1910. Cox resigned in September, and a committee was appointed to run the company; the Price-Waterhouse Company report was made, and it does not appear that Cox ever saw it or read it or knew of its contents except as given in his hearing soon after the report was made, when it was stated that the report showed that the Ford & Johnson Company was able to pay its debts and forty-five cents on its preferred stock. This report was no doubt in the mind of the defendant at all times thereafter.

The report of the examining committee of the trust company was made January 3, 1911, and the chairman of the committee was Mr. Moch, a witness for the state. This report shows loans to the Ford & Johnson Company of $651,866.22 on collaterals valued at $415,563.52, leaving a balance of $236,402.69, as to which the committee say:

"Deducting the total amount of collateral from the loans, there remains a balance unsecured of $236,402.69, which is more than covered by the value of the plant, and real estate of the Ford & Johnson Company, and which if liquidated we are assured by reports of the expert accountants, will be ample to pay this balance. For further particulars regarding these loans we would refer you to the officers of the company who will explain in detail the plan of reorganization of the Ford & Johnson Company, which it is hoped will eventually and within two years wipe out the entire debt carried by this company." See minutes of the board of directors, January 3, 1911, p. 161.

Cox was present at this meeting and evidently heard this report.

On the part of the state it is claimed the Ford & Johnson Company had lost money in large amounts prior to the resignation of the defendant as president, and that on one occasion he refused Powell a loan for the company, saying it should not "have another dirty dime." Does this expression indicate that he was wilfully attempting to defraud the trust company? It

appears that when the eastern banks refused to extend the notes for $200,000 which had been given by the company at the instigation of Powell, that this defendant and others endorsed the notes, and the trust company agreed that if the endorsers were required to pay the notes, that they should be reimbursed as provided in the resolution; and that the directors of the trust company, upon the demand of the state banking department, agreed on May 2, 1911, to reduce the Ford & Johnson Company loan to the legal limit and to procure substituted collateral for the Ford & Johnson collateral to other loans.

Does the evidence show the defendant Cox knew the Ford & Johnson Company was unable to pay its debts? Is the evidence consistent with the honest belief that the company not only was solvent, but would be able to continue in business? There is no evidence tending to show Cox was technically familiar with the chair business, or that he was an expert accountant, or that he had any source of information of the Ford & Johnson Company except as above stated.

Whatever may have been the difficulties with Powell, the Price-Waterhouse Company report confirmed Cox and others in their belief that the Ford & Johnson Company was solvent. The report of the examining committee of the trust company in January, 1911, gave further support to this belief. The advice of the attorney for the trust company added strength to it.

It was charged in argument that the defendant is chargeable with knowledge of the actual facts, or that knowledge was imputed to him of such facts, and that what he might have learned, he is presumed to know.

*Wharton on Criminal Law,* Section 156, says:

"But in all cases the defendant should be judged by the information upon which he acted, rather than the accuracy of his information."

If civil liability will not be maintained against directors of a bank on such imputed knowledge of its affairs, how much less will criminal liability with its greater and ruinous consequences be enforced? *Mason* v. *Moore et al,* 73 O. S., 275.

In view of these reports and facts, what did Cox know of the condition of the Ford & Johnson Company when these loans were made? Was Powell right in his valuation, or was the Price-Waterhouse Company right? Was the Ford & Johnson Company solvent? The executive committee was told that the Price-Waterhouse Company, found that it was.

Was the real estate ample to pay the unsecured balance? The examining committee thought it was and so reported. Then, by the evidence Cox was informed and had a right to believe the Ford & Johnson Company was solvent. His source of information was reliable, and he evidently relied on it.

Fourth. The next point made is: "There is no evidence that the Ford & Johnson Company at the time of the loans complained of, did not have sufficient assets to pay all liabilities."

Whether this point is very important may be questioned —because if this defendant had reasonable grounds to believe the company did have such assets, even an honest mistake could not render him guilty of an offense, and if he did so believe and loaned money which he believed was in the interest of the trust company, he would not be guilty of any offense.

Fifth. "There is no evidence of any intention on the part of this defendant to injure or defraud the Cincinnati Trust Company or any other person or corporation."

If the evidence fails to show participation by the defendant Cox in making the loans charged, then any intent or purpose he might have had would be immaterial, but the court does not feel justified in disposing of this point in this brief manner. We are dealing with dates and transactions, the last of which is at most two years old.

It is a trite saying that "hindsight is better than foresight." Had the officers and directors of the trust company known that the Ford & Johnson Company was reasonably certain to go to the wall, would they have made the loans? It seems reasonable to infer that the loans would not have been made but for the belief that they would be repaid. Mr. Moch testified that in authorizing and approving these loans, he believed they would be paid and that he had no intent to injure or defraud. He

seems to have had the same information, even greater knowledge of the facts than the defendant. And if he, as the state's witness, says that he believed the transactions were honest and justified by the circumstances and the facts as stated, how can it be said that the defendant is not equally honest and justified in his actions?

The presumption of law is that the dealings of the officers and directors of the trust company, in their relations with it, were honest and that they were innocent of any criminal intent in their actions. *Greenleaf on Evidence,* Sections 34, 40.

In arriving at their intent we must endeavor in our mind's eye to occupy their places and positions as they were at the time of the act; to know what they knew and face the demands and possibly crises as they faced them—in fancy, to be for a time officers and directors of the trust company, in 1910 and 1911, with their duties and responsibilities and with the situation as it was, as we can best ascertain it.

In the language of the great Pinckney:

"If the heart be uncontaminated by corrupt intentions, the man is innocent, for it is motive that qualifies actions. As it will be with *God,* so it is with the man; the latent intention of the heart must be searched."

The state banking act did not operate on the trust company until April 1, 1910. At that time the Ford & Johnson Company was indebted to the trust company in a large amount. The court will not repeat the evidence as heretofore stated, but will be satisfied by saying that with the reports and information given to the officers and directors, the defendant was justified in the belief and hope that the trust company would be fully paid its loans, and the other company eventually prosper.

The presumption of law that he was innocent of fraudulent intent, which presumption is evidence in his favor, is not overcome by substantial evidence.

It was suggested in argument by the Attorney-General that the defendant and others should have refused to make loans, in view of the supposed critical situation of the Ford & Johnson Company, that $525,000 had been loaned, and the trust

company should have refused the money for pay-rolls. And it appears in evidence that the money loaned as charged in this indictment was used by the Ford & Johnson Company for that purpose.

Now it seems that these officers and directors thought it better to make further advances so as to ultimately recover its entire debt. If this were a mistaken policy, no matter how it turned out, if they were honest in their endeavors to save the assets of the trust company, there is no criminal purpose and no fraudulent design.

The intent to injure or defraud must have been co-existent with the fact, and the court is of the opinion that the acts were at least as consistent with innocence as with guilt; and under the authorities the legal presumption of innocence is not overcome.

Upon the question of the good faith of the officers and directors, it may also be considered that they were advised by the counsel for the trust company to make all the loans, and while ordinarily advice of counsel is not a defense, it is relevant on a question of intent to defraud and like subjects; and if it appears that after full disclosure of facts to the counsel he advises a certain course which is followed, his advice given in good faith is a defense.

The attention of the court has been called to the opinion of the referee in bankruptcy in the Ford & Johnson Company, which, in passing upon the validity of some mortgage issued by the company (as the court recollects it) he said in substance that the bank officials believed, and there was reasonable hope that the bankrupt would survive its financial trouble.

Sixth. The next point is, ''That the evidence shows that the moneys and funds of the bank were not affected by the transactions complained of, but if anything was affected, it was a credit or credits, and there is no charge made in any of the counts of the indictment of any misapplication of the credits of the bank.''

This point raises a question of law only, as the facts are very plain. The indictment charges misapplication of moneys and funds through certain other banks, by drawing against credits in those banks to make the loans. The evidence is that

the trust company had general deposits in the First and Second National Banks, and that drafts were made upon these accounts which were charged to the trust company account, and ultimately the amount of the draft was passed to the credit of the Ford & Johnson Company; that no money or funds were taken out of the trust company's vaults to pay the drafts or any of them or any part of them.

Under this state of facts, does the evidence support the allegations that the defendants wilfully misapplied the moneys and funds of the trust company?

The statute as stated, uses the terms, "money, funds, credit or property." Section 44 of the original act, now General Code 12473, used the plural term "credits," but this was changed to the singular in the code. The original act used the terms "moneys, funds and credits," as they are found in the United States Revised Statutes, 5209.

What was the relation between the trust company and the other banks? Our Supreme Court has said that:

"Ordinarily the relations between a general depositor and the bank is that of debtor and creditor." *Orme* v. *Baker*, 74 O. S., 337-346.

Again, it has said:

"Money received by a bank on general deposit becomes the property of the bank, and its relation to the depositor is that of debtor and not of bailee or trustee of the money." *Bank* v. *Brewing Co.*, 50 O. S., 151.

Attention is also called to the latest book on the subject, *Magee on Banks and Banking*, Section 171.

"Money" and "funds" of the trust company was what it had on hand, no part of which was taken for these loans. The company had no "money" or "funds" on deposit with the other banks. It had a credit deposit and checking account and no more.

The decisions construing the language of this statute are very few, but it seems to be generally conceded the terms "money," "funds" and "credits" do not refer to the same kinds or classes of property.

The Supreme Court of this state had before it the same terms under the free banking act, General Code, Section 12474, in the case of *State* v. *Davis,* 85 O. S., 43. In deciding that certificates of stock were not moneys or credits, the court gave its unqualified approval to the case of *U. S.* v. *Smith,* 152 Fed. Rep., 542. In the latter case Judge Evans, in considering the meaning of the terms "money," "funds" or "credits," indulges in quite an elaborate discussion concerning them. He says (p. 54):

"The word 'money' is doubtless equivalent to currency, and its meaning is apparent. But Congress could not have intended that the word 'funds' or the word 'credits' should be construed to mean the same thing as the word 'money' or its equivalent, 'currency,' or that the word 'funds' should be regarded as synonymous with the word 'credits.' The three words do not mean, and evidently were not expected to be construed as meaning the same thing, as mere tautology was not designed. * * * A careful consideration induces the court to agree with Judge Priest in his opinion in the case of *U. S.* v. *Greve* (D. C.), 65 Fed. Rep., 489, that the words 'funds' has a different meaning from the word 'moneys' as used in the statute. * * *

"The remaining word 'credits' (says Judge Evans), refers to something nearer to the bank's daily business transactions, and should be given a wider meaning from that of either of its associate words. * * *

"But without enlarging upon the reasons for doing so, the court has reached the conclusion that the word 'credits' used in the statute means debts due the bank or promises to it to pay money, namely such as its notes and bills receivable, as distinguished from more permanent investment securities. * * * Stated shortly, the court is of the opinion that the word 'moneys' refers to the currency or circulating medium of the country; that the word 'funds' refers to government, state, county, municipal or other bonds, and the other forms of obligations and securities in which investments may be made; and that the word 'credits' refers to notes and bills payable to the bank and to other forms of direct promises to pay money to it."

This extended quotation is made because of the clearness and certainty of the court's holding. It would seem that the approval of the opinion of Judge Evans by the Supreme Court of this state, leaves this court without any duty but to follow it,

unless it is in any wise affected by an unreported case, in the 86 O. S., 324, *State* v. *Smith*. The latter case was a prosecution for embezzlement of money under the statute making it an offense to embezzle "anything of value."

The brief for the state, which is the only means the court has of knowing anything of the facts, sets forth that moneys of the employer were drawn from the depository upon checks, and the circuit court seems to have reversed the judgment of conviction.

What induced the judgment of the Supreme Court does not appear, but it is very clear the court was not construing words such as "moneys" and "credits." In that case the defendant was guilty of embezzlement if he converted "anything of value."

In this case the defendants are guilty only in case they wilfully misapplied "moneys and funds of the trust company."

In the Davis case, *supra,* it was held that certificates are not money or credits, neither is a horse, which the company might own. The defendants are not charged with misapplying credits. The only charge is that they misapplied moneys and funds with intent to defraud; there is no charge that they misapplied a credit with intent to defraud; and if they misapplied species of property not included in moneys, funds and credits, they could not be convicted on an indictment charging moneys, funds and credits.

The description of the property is essential and must be substantially proved. Support for the opinion of Judge Evans is found in a case cited by the prosecuting attorney in the argument, to-wit, *State* v. *Mispagel* (Mo.), 106 S. W., 513:

"First. In an information for embezzlement or in an information for larceny, the property embezzled must be described and the proof must be in substantial accord with such description.

"Second. A charge of embezzlement or larceny of money is not sustained by proof of embezzlement of a draft or check."

Many authorities are cited in the opinion of the court in accord with it. The Calkins case, 18 O. S., 366, does not seem to throw any light on this subject, as the court was there con-

struing a statute of embezzlement of property under the care of the accused, and held that property stored and subject to his order was "under his care."

The cases of *Territory* v. *Hale*, 13 N. M., 181, and *Barkley* v. *State*, 53 Neb., 511, are also referred to by the state, but the court feels it would be bound to follow the decision of the Supreme Court in the Davis case referred to; however in the apparent conflict of authorities, the court does not feel called upon to decide this point, but will place its decision upon other and certain grounds.

The last point in the motion is that: "The evidence shows that the loans complained of were authorized by the executive committee and the board of directors; for that reason no crime was committed and no misapplication occurred."

A corporation being an intangible, an artificial body, can not, as such, perform any physical act, or entertain any intent, or have any knowledge. It, perforce, acts through agencies of one sort or another, and these agencies have certain powers, duties and responsibilities, as has been stated.

General Code, Section 9727, provides that:

"The corporate powers, business and property of corporations formed under this chapter shall be exercised, conducted and controlled by the board of directors."

In *Belting Co.* v. *Gibson*, 68 O. S., 442-449, it is said:

"In this state the corporate powers, business and property of the corporation *must* be exercised, conducted and controlled by the board of directors. Section 3248, Revised Statutes."

Article 6 of the code of regulations conforms to the statute. The executive committee is charged by statute, General Code, 9728, with the approval or disapproval of all loans, and by the by-law No. 2, this committee is bound to supervise and pass upon all loans and keep minutes, and submit records of loans to the board of directors for approval at each meeting (General Code, 9729). This committee was composed of members of the board of directors. Its members attended board meetings and had before them the same reports, information and knowledge that the board had at the time of any particular loan de-

scribed in the indictment; the executive committee had the advice of the counsel for the company, and it also had, which is most important, and no doubt was most influential in its effect upon them, the unqualified approval of all the loans previously made to the Ford & Johnson Company. The record fails to show any lack of approval by the board of the action of the executive committee, or any dissent from its actions. On the contrary, the loans were approved month by month as they were made by action such as the following:

"The loans and investments made since the last meeting of the board were submitted, and upon motion of Mr. Parrish, seconded by Dr. Heady, same were approved."

Not one of the loans lacked this approval. If wilful misapplication were made with intent to defraud, it would acquire no validity, if subsequently it were brought to the attention of the board and its approval obtained.

But a different question is presented where repeated and successive loans are made to a person or company, all of which were within the knowledge of the board, and it gives its consent. Such a case is fully within and covered by the language found in *Evans* v. *U. S.*, 153 U. S., 582, on page 593, as follows:

"If the directors of this bank had authorized their cashier, either generally or in this particular case to discount paper, it was clearly matter of defense."

The repeated approval of these loans without objection was equivalent to a general authority, if the executive committee was not already vested with the same.

As the court understands it, the state does not deny that the authority of the board of directors to make loans is a good defense. At least, so the court understands the brief of the state on the motion to quash, where it is said:

"Such is the law, settled in the case of *Evans* v. *United States.*"

But it is claimed the action of the executive committee is no protection to those on the committee, and that the approval of the board is of no effect.

If this were a case of conspiracy to defraud the company by the officers or the executive committee, or by them, and the directors, there would be some color to the state's position. But the state says there was no conspiracy. It is presumed there was none. None has been proved nor attempted to be proved.

Then are men constituting a board or committee to be held responsible as criminals because they perform the duty for which they are appointed, using their best judgment as to the wisdom of their course?

Judge Taft in the Youtsey case in 91 Fed. Rep., 70, held that it was incumbent on the government to show affirmatively that the board had no knowledge and gave no consent to the alleged misapplication.

Judges Jackson and Sage in the Harper case, 33 Fed., 431, at 479, held to the same effect.

The Supreme Court of the United States, Britton case, 108 U. S., 193, held that:

"If an officer of a bank who was insolvent procured a loan on his note endorsed by an insolvent person, and these facts were known to the directors, and they allowed the loan, it approached the verge of absurdity to charge the officer with wilful misapplication with intent to defraud, because he used the moneys loaned by the board."

Our distinguished Attorney-General, in his learned brief, calls the attention of the court to the case of *Breese* v. *United States*, 106 Fed. Rep., 685. The court is of the opinion that this is not a case in point and does not apply to this case.

As such negotiations and credits are permitted by the national banking law, and the board of directors or the constituted discount committee, if the transaction undergoes their observation and approval, the vice-president who obtains the benefit of the credit is not culpable, unless he procures the approval of some fraud or deception.

Is there any evidence in this case that the defendant secured the approval of the committee or the board of directors by any deception or fraud?

See also *United States* v. *Smith*, 152 Fed. Rep., 542, 547.

If the law is that the knowledge or consent of the executive committee or board of directors is a defense, then necessarily if it appear in the state's case that such consent was given, there is no case left to submit to the jury.

The authorization of the loan by the executive committee is a complete defense in this case, and the approval of the board of directors under the circumstances is likewise.

In the Prettyman case before referred to, in 180 Fed. Rep., the court said:

"Gross maladministration, and inexcusable breach of duty on the part of the officers of a national bank in its management, however disastrous to its stockholders, are not punishable unless in violation of the law."

Holding the views of the case the court does, after a long and laborious examination of the facts and the law, there is no course open for it, but to grant the motion of the defendant, upon the grounds:

First. That the evidence fails to show that Cox the defendant made any of the loans or misapplied any of the moneys and funds of the bank.

Second. That there is no evidence offered tending to show an intent by the defendant Cox to injure or defraud the bank.

Third. The evidence shows that the defendant Cox was justified in believing the Ford & Johnson Company was solvent and would repay all these loans.

Fourth. The loans were authorized in advance by the executive committee and approved by the board of directors, which is a full and complete exoneration.

The jury will, therefore, be instructed to return a verdict of not guilty.

Gentlemen of the jury, the court feels it to be its duty, under the law and the evidence in this case, to instruct you to return a verdict of not guilty, and the court so directs you. The clerk will give you the verdict which your foreman will sign and return to the court.